2022 IL App (2d) 220418-U
No. 2-22-0148
Order filed November 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| BUTLER BROTHERS SUPPLY DIVISION, LLC, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 21 L 583 |
| HN PRECISION COMPANY, SCOTT NARROL, JEANNE PERRON, and PREMIER INDUSTRIAL GROUP, LLC, d/b/a HN Precision, | ) ) ) ) | Honorable Luis A. Berrones, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Schostok concurred in the judgment.

## ORDER

¶ 1     *Held*:  (1) Appellate court had jurisdiction to consider appeal from portion of count of plaintiff's complaint which was dismissed without prejudice and referred to arbitration pursuant to Illinois Supreme Court Rule 307(a)(1); (2) appellate court had jurisdiction to consider appeal from remaining counts, which were dismissed with prejudice, pursuant to Illinois Supreme Court Rule 304(a); (3) trial court correctly dismissed without prejudice and referred to arbitration count against defendant company; (4) trial court properly dismissed with prejudice portions of complaint against defendant company's president and employee because plaintiff failed to adequately plead with specificity promissory fraud or aiding and abetting promissory fraud; and (5) trial court correctly dismissed with prejudice count

against third-party purchaser because plaintiff failed to specifically plead facts from which actual knowledge or willful ignorance of fraud could be inferred.

¶ 2                                    I. INTRODUCTION

¶ 3     Plaintiff, Butler Brothers Supply Division, LLC, filed a three-count complaint in the circuit court of Lake County against defendants, HN Precision Company (HN), Scott Narrol (Narrol), Jeanne Perron (Perron), and Premier Industrial Group, LLC d/b/a HN Precision (Premier). Count I of the complaint alleged that HN, Narrol, and Perron committed common-law fraud by perpetuating a scheme to induce plaintiff to deliver goods to HN for which HN did not intend to pay. Count II alleged, in the alternative, that Narrol and Perron aided and abetted HN in its scheme to defraud plaintiff. Count III was directed against Premier and alleged that Premier had accepted the fruits of the allegedly fraudulent scheme orchestrated by HN, Narrol, and Perron. Premier moved to dismiss the count against it pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)). HN, Narrol, and Perron filed a combined motion to dismiss the counts against them pursuant to sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619, 2-619.1 (West 2020)). Following oral argument, the trial court dismissed without prejudice count I against HN and referred the matter to arbitration pursuant to the arbitration clause in a contract between plaintiff and HN. The court dismissed the remaining defendants (Narrol, Perron, and Premier) with prejudice. Plaintiff now appeals, arguing that the trial court erroneously dismissed count I of its complaint against HN based on the premise that the common-law fraud claim asserted therein was based on a breach of its contract with HN. Plaintiff further argues that the trial court erred in dismissing the counts against Narrol, Perron, and Premier because its complaint set forth adequate facts to support the claims against each of those defendants. We affirm.

¶ 4                                    II. BACKGROUND

¶ 5 Plaintiff's complaint alleged in relevant part as follows. Plaintiff is an industrial supply distributor with its headquarters in Lewiston, Maine. In addition to supplying industrial materials to companies across the country, plaintiff offers its customers other services, including full stockroom management, vendor-managed inventory, and point-of-use vending machines. HN was a full-service precision machining manufacturer. HN provided design and manufacturing services to businesses in the general transportation, off-highway vehicles, industrial, and armaments markets. HN's headquarters and manufacturing facility were based in Lake Bluff, Illinois.

¶ 6 The business relationship between plaintiff and HN began in December 2011 when they signed an integrated supply agreement. The parties renewed their integrated supply agreement several times thereafter. The most recent integrated supply agreement (Agreement) was executed in December 2019 and was for a three-year term commencing on January 1, 2020, and expiring on December 31, 2022. The Agreement provided that plaintiff would manage HN's storeroom and tool-crib functions, including purchasing, receiving, issuing, stocking, and controlling certain categories of items and plaintiff would provide staffing for these services. Based on the Agreement, HN could purchase supplies from plaintiff through a catalog of items approved by HN available at HN's facility (Tool Crib Inventory) or through one-time or spot purchases (Spot Buys) outside of the list of items in the Tool Crib Inventory. The Agreement also provided that plaintiff would consign a maximum of $50,000 in inventory to HN. The Agreement required HN to pay plaintiff no later than 75 days from receipt of invoice. In connection with the consigned inventory, plaintiff filed a UCC-1 financial statement as a consignment creditor of HN.

¶ 7 In practice, one of plaintiff's employees worked on-site at HN's facility to maintain the storeroom and tool crib by monitoring and replenishing the Tool Crib Inventory when supplies were low, based on minimum and maximum levels set by HN. Plaintiff would then invoice HN

for the products it had replenished. In addition, HN also made Spot Buy purchases. HN would request a certain product in a certain quantity, and plaintiff would provide a quote for the requested items. Once HN approved the quote in writing (via email), plaintiff would deliver the order to HN and then send an invoice to HN. Perron, who served as HN's materials manager, was regularly involved in either the actual ordering or in the confirmation of orders on behalf of HN. Each month, plaintiff and HN would meet to go over the month's ordering, pricing, and other issues. Perron regularly attended these meetings. Perron directly reported to Narrol, HN's president and chief financial officer (CFO), as well as to John Devine, HN's chief executive officer.

¶ 8        In March 2020, HN began to fall behind on the payment of some of its invoices to plaintiff. Plaintiff emailed Narrol regarding the accounts receivable, noting that HN had more than $378,000 in overdue payments. Following additional correspondence between plaintiff and Narrol, they agreed to a payment plan for the amount in arrears.

¶ 9        In August 2020, HN requested an extension of payment terms, seeking a temporary 90-day payment term instead of the 75-day term provided for in the Agreement. Plaintiff agreed to HN's request. As of December 2020, HN was still paying plaintiff on a 90-day payment term. At that time, Perron began communicating with plaintiff through phone calls and emails about formally extending the 90-day payment term. During a January 8, 2021, phone call between Perron and two of plaintiff's employees—Kelly John (John) and Ron Cote (Cote)—Perron stated that she would discuss the payment terms with Narrol and report back at a meeting on January 13, 2021. At the January 13, 2021, meeting, Perron requested that the 90-day payment term be extended until April. Plaintiff agreed to the extension.

¶ 10        The extension of the 90-day payment term was included as an agenda item for meetings between plaintiff and HN held in the months of February, March, and April 2021. Perron attended

each of those meetings. During the February 2021 meeting, Perron emphasized HN's desire to extend the 90-day payment term until April. By March 2021, HN was not meeting the extended 90-day payment term. During the March 2021 meeting, HN and plaintiff discussed cost-saving measures and inventory reduction. During the same meeting, Perron stated how pleased she was with the work that plaintiff and HN were doing together. According to John, who attended the March meeting, HN emphasized during the March meeting that "they should be back to normal by April," referring to the extended payment terms. The April 2021 meeting was held on the 14th of the month. Perron attended the meeting and discussed HN's relationship with plaintiff, inventory needs, ordering, and other matters. In addition, at the April meeting, Perron asked to continue the 90-day terms through April.

¶ 11    From December 2020 through April 2021, HN continued to order goods and services from plaintiff through the various platforms noted above. Perron was involved throughout this period, both in the specific ordering of goods and in confirming orders, often providing the necessary approval to proceed with certain orders. As of April 15, 2021, plaintiff's total accounts receivable for HN was approximately $660,225.88.

¶ 12    On or about April 20, 2021, plaintiff learned that on April 15, 2021, Premier had acquired HN's assets from PNC Bank (HN's bank and senior secured lender) through a secured party sale. Premier is an Illinois limited liability company that was formed on March 17, 2021. Premier is owned and was established by Ventoux Industrial Holdings, LLC (Ventoux), a private equity firm that established Premier for the purpose of purchasing HN's assets. According to an April 20, 2021, email to plaintiff from Gregory Wales, a managing partner at Ventoux and a manager of Premier, Ventoux "began *** conversations with [HN's] ownership group several months ago" and "negotiated a deal with [HN's] secured creditor, PNC Bank" before purchasing HN's assets

through the sale. Wales explained that Ventoux, through Premier, had the "intent *** to focus on rebuilding the company, while retaining as many of the employees as possible." Wales also explained that Premier had purchased "the assets of [HN], and did not assume any trade payables." Wales attached a copy of the notice of the impending sale dated March 24, 2021. According to Wales's email, the notice was sent to all of HN's creditors, including plaintiff. However, plaintiff represented that it had not seen or received the notice prior to Wales's email. In a subsequent email dated April 21, 2021, Wales reiterated that "[a]ny tooling sold to [HN] prior to April 15, 2021 is not the responsibility of Premier" but "any new products sold on or after April 15, 2021 should be invoiced to Premier."

¶ 13     Plaintiff filed its three-count complaint against HN, Narrol, Perron, and Premier on August 4, 2021. Plaintiff's complaint alleged that, beginning in December 2020, after 10 years of doing business with plaintiff, HN, through the acts of Narrol and Perron, among others, initiated a months-long scheme to defraud plaintiff by placing orders with plaintiff for which it had no intention to pay. Plaintiff alleged that each of the orders was a promise by HN to pay plaintiff for the ordered goods, despite that HN had no intention to pay for the orders due to its knowledge of the impending sale of HN's assets and the sale terms. Plaintiff then alleged that, in addition to the orders themselves, HN engaged in the following conduct between approximately December 2020 and the sale to induce plaintiff to fulfill the orders despite the fact that it had no intention to pay:

> "(a) HN, through Perron, negotiated with [plaintiff] in e-mail and telephone in December 2020 and January 2021 for the extended payment terms of 90 days until April 2021.

> (b) HN held the customary [m]onthly [m]eetings with [plaintiff] in January, February, March, and April 2021 to discuss the month's ordering, future orders, and any

other issues, including discussion of the extension of the 90-day payment term. The last of these [m]onthly [m]eetings occurred on April 14, 2021, the day before the [s]ale. At no point during any of the [m]onthly [m]eeting [*sic*] was the upcoming [s]ale disclosed. These [m]onthly [m]eetings, including the one on April 14, were attended by Perron, who has admitted that she learned of the [s]ale prior to April 14, 2021.

(c) Perron held weekly calls with [plaintiff] employees John and Cote, discussing payment terms and ordering.

(d) HN continued to maintain a [plaintiff] employee on-site at the [f]acility as part of the Tool Crib management without mention of the upcoming [s]ale."

Plaintiff also alleged that it relied upon the truth of the orders and representations and thus fulfilled the orders. Plaintiff stated that it "had every reason to believe, based on its long business relationship with HN and on the [r]epresentations themselves, that everything was business-as-usual, and that HN would be current on its payments." Plaintiff further stated that it had no means to know the truth of HN's financial situation, the plans for the sale, or HN's intention not to pay plaintiff.

¶ 14 Count I of plaintiff's complaint is entitled "Common Law Fraud (Promissory Fraud)" and is directed against HN, Narrol, and Perron. Count I alleged that HN, Narrol, and Perron perpetuated a scheme to induce plaintiff to deliver goods to HN for which HN did not intend to pay. Specifically, plaintiff alleged that, at least from January 15, 2021, onward, HN, Narrol, and Perron were aware that HN was in default, that HN's assets would be sold at a secured party sale, and that plaintiff's invoices arising out of goods delivered in the 90 days before the sale would not be paid for. Plaintiff further alleged that HN, Narrol, and Perron perpetrated a fraudulent scheme by placing orders with plaintiff for which HN had no intention to pay and that HN, through Perron,

made representations designed to convince plaintiff that it would make payment in accordance with the modified payment terms. Plaintiff asserted that as a result of the fraudulent scheme orchestrated by HN, Narrol, and Perron, it sustained damages of not less than $660,225.88. Count II is entitled "Aiding and Abetting Common Law Fraud" and alleged, in the alternative, that Narrol and Perron aided and abetted HN in its scheme to defraud plaintiff. Plaintiff asserted that as a result of the fraudulent scheme aided and abetted by Narrol and Perron, it sustained damages of not less than $660,225.88. Count III is entitled "Common Law Fraud (Fruits of the Fraud)" and is directed against Premier. Count III alleged that Premier had accepted the fruits of the allegedly fraudulent scheme orchestrated by HN, Narrol, and Perron. Plaintiff asserted that, as a result of Premier's acceptance of the fruits of the promissory fraud described in count I, plaintiff sustained damages of not less than $660,225.88. Plaintiff requested compensatory and punitive damages, as well as interest, costs, fees, and "any other damages to which it proves itself entitled." Plaintiff attached to the complaint a copy of the Agreement and a list of HN's outstanding invoices.

¶ 15    On October 22, 2021, Premier filed a motion to dismiss count III of plaintiff's complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2020)). Premier argued that the count against it must be dismissed because plaintiff failed to allege with specificity how it was aware of the allegedly fraudulent scheme perpetrated by HN, Narrol, and Perron.

¶ 16    On November 5, 2021, HN, Narrol, and Perron filed a combined motion to dismiss counts I and II of plaintiff's compliant pursuant to sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619, 2-619.1 (West 2020)). HN, Narrol, and Perron argued that plaintiff's complaint should be dismissed because plaintiff's claims concern the alleged nonpayment of purchase orders and the Agreement between plaintiff and HN mandates arbitration of claims that arise from the "Agreement and any associated purchase orders." In support of this position, HN, Narrol, and

Perron observed, among other things, that the amount of damages claimed by plaintiff ($660,225.88) makes up plaintiff's outstanding accounts receivables. Although not parties to the Agreement, Narrol and Perron further argued that the claims against them should be submitted to binding arbitration under the theory that arbitration is a favored method of dispute resolution or as third-party beneficiaries to the Agreement. In the event that the trial court denied its argument based on the Agreement's arbitration clause, HN, Narrol, and Perron alternatively argued that plaintiff's complaint should be dismissed because, among other reasons, (1) plaintiff is improperly seeking to convert a breach of contract claim into a fraud claim in an attempt to expand its potential damages, (2) plaintiff cannot meet the elements necessary to plead its fraud claims because the parties never agreed to change the payment terms for the purchase orders, and (3) plaintiff fails to plead fraud with specificity as to Narrol.

¶ 17    On January 10, 2022, plaintiff filed a response to defendants' motions to dismiss. As to HN, Narrol, and Perron, plaintiff argued that the action should not be dismissed in favor of arbitration because the claims against those defendants do not fall within the Agreement's arbitration clause. Plaintiff contended that the arbitration clause limits arbitrable matters to those "arising in connection" with the Agreement, language which, under applicable law, must be interpreted narrowly. Plaintiff asserted that the fraud claims pleaded in the complaint did not arise in connection with the Agreement and any associated purchase orders, relate to any matters specifically mentioned in the Agreement, or require the construction of a single provision of the Agreement. Rather, the dispute arose "in connection with *** Defendants' lies, deceptions and fraudulent conduct." Plaintiff further asserted that the fact that the amount of damages alleged in the complaint equals the value of the unpaid orders does not convert the complaint into a contract claim. Additionally, plaintiff argued that HN, Narrol, and Perron failed to refute the well-pleaded

claims of promissory fraud asserted in the complaint and that the complaint sets forth ample facts, from which necessary or probable inferences may be drawn, to support counts I and II of plaintiff's complaint. Plaintiff also disputed the remaining arguments made by HN, Narrol, and Perron. Plaintiff contended that Narrol and Perron cannot invoke the arbitration provisions as third-party beneficiaries to the Agreement because they are not parties to the contract. Plaintiff also maintained that the fact that the parties did not amend the Agreement to extend the payment terms is immaterial to the claims alleged in the complaint. Finally, plaintiff claimed that it adequately pleaded fraud with specificity as to Narrol.

¶ 18    As to Premier, plaintiff argued that, having satisfied the underlying fraud claim (as set forth in its response to HN's, Narrol's, and Perron's motion to dismiss), its complaint had to set forth facts that demonstrate that Premier accepted the fruits of the promissory fraud knowing the means by which they were obtained. Plaintiff argued that it satisfied this requirement because Premier purchased the assets of HN, which had been "enhanced" as a result of HN's fraudulent conduct, without assuming any of HN's trades payable. Further, plaintiff argued that the complaint establishes that Premier knew about the underlying fraud, or at the very least, was willfully ignorant about the consequences of the sale on vendors like plaintiff, based on Wales's emails and the timing of the creation of Premier as an entity.

¶ 19    Thereafter, defendants filed replies in support of their motions to dismiss plaintiff's complaint. On April 27, 2022, the trial court heard oral argument on the motions to dismiss and entered an order granting both motions.[1] The court's order provides as follows:

_____

[1] The record on appeal does not contain a report of proceedings for the April 27, 2022, hearing on the motions to dismiss or an acceptable substitute. See Ill. S. Ct. R. 323(c) (eff. July 1,

"After reading the parties' briefs and hearing oral argument on Defendants' Motions to

Dismiss, the Court[:]

    1) Dismisses the claims against HN *** without prejudice, on the basis that [plaintiff] and HN *** should arbitrate their dispute pursuant to clause 22(a) of their *** Agreement; and

    2) Dismisses the remaining defendants (Premier, Narrol and Perron) with prejudice.

    3) The Court finds that pursuant to [Illinois Supreme Court] Rule 304(a) [(eff. Mar. 8, 2016)], there is no just reason for delaying enforcement or appeal of this order."

On May 4, 2022, plaintiff filed a notice of appeal from the April 27, 2022, order.

¶ 20                                        III. ANALYSIS

¶ 21     On appeal, plaintiff argues that the trial court erred in dismissing without prejudice its claim for common-law fraud against HN and referring the matter to arbitration because the arbitration

---

2017). Plaintiff, as the appellant, bears the burden of presenting a sufficiently complete record of the proceedings to support its claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984); *Short v. Pye*, 2018 IL App (2d) 160405, ¶ 48. Although we resolve against plaintiff any doubts arising from the record's incompleteness (see *Foutch*, 99 Ill. 2d at 392), our review here is limited to the pleadings, motions, and supporting documents, which are part of the record. See *Bezanis v. Fox Waterway Agency*, 2012 IL App (2d) 100948, ¶ 11. In addition, as we discuss more thoroughly below, the issues raised in this appeal present questions of law that we review *de novo* without showing deference to the trial court's reasoning. See *Bezanis*, 2012 IL App (2d) 100948, ¶ 11. As such, the lack of a transcript from the April 27, 2022, hearing, or an acceptable substitute therefor, does not hinder our review.

provision in the Agreement between plaintiff and HN does not apply to this dispute. Plaintiff further argues that count I of its complaint properly sets forth facts sufficient to support its claim of promissory fraud against HN. Plaintiff also argues that the trial court erred in dismissing with prejudice (1) its claims for common-law fraud (count I) and aiding and abetting fraud (count II) against Narrol and Perron and (2) its claim for common-law fraud (count III) against Premier. Prior to addressing plaintiff's claims, we must first discuss the issue of appellate jurisdiction.

¶ 22                           A. Jurisdiction

¶ 23    Although none of the parties has questioned our jurisdiction to consider plaintiff's appeal, a reviewing court has an independent duty to confirm its jurisdiction and to dismiss an appeal, or portion thereof, if jurisdiction is lacking. *Johnson v. Armstrong*, 2022 IL 127942, ¶ 18; *In re Marriage of Alyassir*, 335 Ill. App. 3d 998, 999 (2003). We find it necessary to address the issue of jurisdiction in this case because, while the trial court dismissed the counts against Narrol, Perron, and Premier with prejudice, it dismissed the count against HN without prejudice and referred the matter to arbitration.

¶ 24    Plaintiff's notice of appeal indicates that it was filed pursuant to Illinois Supreme Court Rules 303(a) (eff. July 1, 2017) and 304(a) (eff. Mar. 8, 2016). The jurisdictional statement in plaintiff's opening brief specifies that the appeal was brought "under Illinois Supreme Court Rule 301 from a final judgment entered on April 27, 2022." Rules 301 and 303 allow for the appeal of a final judgment of the circuit court in civil cases. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994) ("Every final judgment in a civil case is appealable as of right."); Ill. S. Ct. R. 303(a) (eff. July 1, 2017) (setting forth the time, filing, transmission, form, contents, and service requirements for notices of appeal in civil cases). An order is final and appealable if it terminates the litigation between the parties on the merits or disposes of the rights of the parties, either on the entire controversy or a separate part

of the controversy. *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008). Rule 304(a) states that "an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). "By its terms, Rule 304(a) applies only to final judgments or orders." *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 24. The special finding contemplated in Rule 304(a) makes a final order appealable, "but it can have no effect on a nonfinal order." *Blumenthal*, 2016 IL 118781, ¶ 24. If an order is not in fact final, the inclusion of Rule 304(a) language in the trial court's order does not confer jurisdiction on the appellate court. *Blumenthal*, 2016 IL 118781, ¶ 24. In this case, the trial court's April 27, 2022, order included Rule 304(a) language. Accordingly, the question becomes whether the order is in fact a final order given that count I against HN was dismissed without prejudice and referred to arbitration.

¶ 25    We conclude that the April 27, 2022, order is not a final order as to HN. As noted above, the trial court dismissed the count against HN "without prejudice" and referred the matter to arbitration. Our supreme court has stated that the inclusion of language in an order stating that a dismissal is "without prejudice," such as occurred here, "clearly manifests the intent of the court that the order not be considered final and appealable." *Flores v. Dugan*, 91 Ill. 2d 108, 114 (1982); but see *Schal Bovis, Inc. v. Casualty Insurance Co.*, 314 Ill. App. 3d 562, 568 (1999) (stating that "the effect of a dismissal order is determined by its substance, and not by the incantation of any particular magic words"). Further, an order compelling arbitration is not a final order. *Royal Indemnity Co. v. Chicago Hospital Risk Pooling Program*, 372 Ill. App. 3d 104, 107 (2007); see also *Pekin Insurance Co. v. Benson*, 306 Ill. App. 3d 367, 375 (1999). Rather, such an order is interlocutory because it is injunctive in nature. *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11 (2001); *In re*

*Marriage of Golden*, 2012 IL App (2d) 120513, ¶ 17; *Nagle v. Nadelhoffer, Nagle, Kuhn, Mitchell, Moss and Saloga, P.C.*, 244 Ill. App. 3d 920, 924 (1993). Because the portion of the April 27, 2022, order dismissing count I against HN was not a final order, we do not have jurisdiction to consider that portion of the appeal under either Rule 301 or Rule 303. Moreover, as noted above, the inclusion of Rule 304(a) language did not confer jurisdiction to this court as the addition of such language cannot convert a nonfinal order into a final, appealable order. *Blumenthal*, 2016 IL 118781, ¶ 24.

¶ 26     Rules 301, 303, and 304(a) are the only rules cited by plaintiff as the bases for our jurisdiction. Nevertheless, we are not deprived of jurisdiction by an appellant's citation to the wrong rule in a notice of appeal. *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 211 (1996) (holding that the citation to an incorrect rule does not deprive the court of jurisdiction to consider appeal). As noted above, orders to compel or stay arbitration are considered interlocutory orders because they are injunctive in nature. *Salsitz*, 198 Ill. at 11; *In re Marriage of Golden*, 2012 IL App (2d) 120513, ¶ 17; *Nagle*, 244 Ill. App. 3d at 924. Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017) provides that an appeal may be taken from an interlocutory order "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." Because the trial court dismissed count I against HN and referred the matter to arbitration, that portion of the court's order granted injunctive relief. Therefore, we have jurisdiction under Rule 307(a)(1) to consider the merits of plaintiff's appeal with respect to the dismissal of count I against HN. *Salsitz*, 198 Ill. 2d at 11 ("An order of the circuit court to compel or stay arbitration is injunctive in nature and subject to interlocutory appeal under paragraph (a)(1) of [Rule 307].").

¶ 27     We also have jurisdiction over the dismissal of the claims against Narrol, Perron, and Premier, albeit under a different rule. In this regard, we note that the April 27, 2022, order

dismissed the claims against those three defendants "with prejudice." The order was therefore a final order as it terminated on the merits the litigation between plaintiff and Narrol, Perron, and Premier. See *Dubina v. Mesirow Realty Development, Inc.*, 178 Ill. 2d 496, 502 (1997) ("A dismissal with prejudice is usually considered a final judgment ***."); *Ally Financial, Inc. v. Pira*, 2017 IL App (2d) 170213, ¶ 29 (same). Although the portion of the April 27, 2022, order directed at the count against HN was interlocutory, the order included language pursuant to Rule 304(a) that there was "no just reason for delaying enforcement or appeal of [the] order." This language rendered the dismissal of the counts against Narrol, Perron, and Premier appealable. *Blumenthal*, 2016 IL 118781, ¶ 24; see also *Hwang v. Tyler*, 253 Ill. App. 3d 43, 45-46 (1993) ("Rule 304(a) applies to final orders that do not dispose of an entire proceeding and requires a finding that the order is appealable."), *abrogated on other grounds by Salsitz*, 198 Ill. 2d at 11-12. Therefore, we also have jurisdiction to consider the merits of plaintiff's appeal with respect to the dismissal of the counts against Narrol, Perron, and Premier.

¶ 28                                    B. Merits

¶ 29     As noted earlier, plaintiff challenges the trial court's dismissal of its complaint on various grounds. Initially, we address the dismissal without prejudice of count I against HN. We will then address the dismissal of counts I and II against Narrol and Perron. Finally, we will address the dismissal of count III against Premier.

¶ 30                              1. Count Against HN

¶ 31     The trial court dismissed count I against HN without prejudice and referred the matter to arbitration. The ruling was premised on the arbitration clause contained in paragraph 22(A) of the Agreement between plaintiff and HN. That paragraphs states in pertinent part as follows:

        "Customer and Supplier shall strive to settle amicably and in good faith any dispute

arising in connection with this Agreement and any associated Purchase Orders. If they are unable to do so, the dispute shall be resolved by binding arbitration conducted under the rules of the American Arbitration Association, as presently in force, by one arbitrator mutually agreed upon between them or appointed in accordance with said rules."

Plaintiff argues that this matter should not have been referred to arbitration because the arbitration provision in the Agreement does not apply to this dispute. Plaintiff observes that courts considering arbitration clauses that provide for the arbitration of disputes "arising in connection" with a contract have been read narrowly to apply only to claims relating to matters specifically mentioned in the contract. See *State Farm Mutual Automobile Insurance Co. v. George Hyman Construction Co.*, 306 Ill. App. 3d 874, 882 (1999). According to plaintiff, its complaint against HN does not relate to any matters specifically mentioned in the Agreement or require the construction of a single provision of the Agreement. Instead, plaintiff maintains, the dispute "arose solely out of, and therefore 'in connection with,' the fraudulent conduct of HN, Narrol, and Perron." Plaintiff further argues that count I of its complaint properly sets forth facts sufficient to avoid dismissal of its claim for promissory fraud against HN.

¶ 32    HN responds that, in granting its motion to dismiss, the trial court correctly determined that the Agreement's arbitration provision applied to this matter. HN contends that, regardless of the moniker plaintiff assigned to the claim, its complaint "arose in connection with the Agreement and/or [HN's] purchase orders" because plaintiff "framed its entire case as premised on the Agreement," attached a list of the purchase orders HN allegedly failed to pay as an exhibit to the complaint, and alleged compensatory damages in the exact same amount as the allegedly unpaid purchase orders. As such, HN reasons, the count against it was subject to binding arbitration.

¶ 33    We previously determined that because an order compelling arbitration is injunctive in

nature, we have jurisdiction to consider the dismissal of count I against HN pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). *Salsitz*, 198 Ill. 2d at 11. In an appeal under Rule 307(a)(1), we are limited to considering whether there was a sufficient showing to sustain the trial court's order compelling arbitration. *Postma v. Jack Brown Buick, Inc.*, 157 Ill. 2d 391, 399 (1993); *Hollingshead v. A.G. Edwards & Sons, Inc.*, 396 Ill. App. 3d 1095, 1098-99 (2009). Where, as here, the trial court enters an order compelling arbitration without an evidentiary hearing, our review is *de novo*. *Hollingshead*, 396 Ill. App. 3d at 1099. Additionally, the scope of an arbitration clause presents a question of contract interpretation, which is also subject to *de novo* review. *Fiala v. Bickford Senior Living Group, LLC*, 2015 IL App (2d) 141160, ¶ 17.

¶ 34    In Illinois, arbitration is a favored method of resolving disputes. *CAC Graphics, Inc. v. Taylor Corp.*, 154 Ill. App. 3d 283, 286 (1987). An agreement to arbitrate is a matter of contract. *Liu v. Four Seasons Hotel, Ltd.*, 2019 IL App (1st) 182645, ¶ 25. However, the parties to an agreement are bound to arbitrate "only those issues they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions as expressed in the language." *Royal Indemnity Co.*, 372 Ill. App. 3d at 110; see also *Flood v. Country Mutual Insurance Co.*, 41 Ill. 2d 91, 94 (1968). Thus, the key factor in determining arbitrability is the intent of the parties and the paramount factor in determining that intention is the scope of the arbitration clause in the parties' agreement. *Green v. Bank One LaGrange*, 266 Ill. App. 3d 344, 348 (1994). When the language of the agreement is clear, the court determines the parties' intent solely from the express language of the agreement, giving the language its plain and ordinary meaning. *Liu*, 2019 IL App (1st) 182645, ¶ 25. Courts also consider the agreement as a whole and cannot make a new agreement by supplying provisions or giving plain and unambiguous language a distorted construction. *Liu*, 2019 IL App (1st) 182645, ¶ 25.

¶ 35    Where an arbitration clause is "generic," meaning that it is nonspecific in designating the arbitrable issues, the court is required to examine the wording of the arbitration clause along with the other terms of the contract in which the arbitration clause is found. *Keeley & Sons, Inc. v. Zurich American Insurance Co.*, 409 Ill. App. 3d 515, 520-21 (2011). A "generic" arbitration clause is characterized by language providing that " 'all claims "arising out of" or "relating to" an agreement' " shall be decided by arbitration. *Keeley & Sons, Inc.*, 409 Ill. App. 3d at 520 (quoting *A.E. Staley Manufacturing Co. v. Robertson*, 200 Ill. App. 3d 725, 729 (1990)). By contrast, where an arbitration clause contains the phrase, "arising out of the agreement" (or a variation thereof), but fails to also include the phrase "or relating to [the agreement]" (or a variation thereof), it is narrower than a generic clause, and any arbitration should be limited to the specific terms of the contract or agreement containing the arbitration clause. *Fiala*, 2015 IL App (2d) 141160, ¶ 19; see also *State Farm Mutual Automobile Insurance Co.*, 306 Ill. App. 3d at 882-83.

¶ 36    With the foregoing principles in mind, we conclude that the trial court correctly determined that the Agreement's arbitration clause applied to the dispute between plaintiff and HN. The Agreement's arbitration clause applies to "any dispute arising in connection with this Agreement and any associated Purchase Orders." Irrespective of whether the arbitration provision is interpreted broadly or more narrowly, plaintiff's claim against HN is subject to the arbitration clause because it clearly is "in connection with" the "Agreement and any associated Purchase Orders." In this regard, plaintiff's claim is predicated upon the alleged failure of HN to pay for orders placed between January 15, 2021, and the date of HN's sale to Premier. Indeed, the very first numbered paragraph of the complaint alleged that "HN—through the acts of Narrol and Perron, among others—initiated a months-long scheme to defraud [plaintiff] *by placing orders with [plaintiff] for which it had no intention to pay*." (Emphasis added.) Plaintiff further alleged

that the extension of the Agreement's 75-day payment terms to 90 days allowed HN to conceal the fact it did not intend to pay for its orders. Similarly, plaintiff alleged that HN's "business-as-usual conduct" in continuing to place orders pursuant to the Agreement continued the purported fraud. These allegations arose from and concerned the Agreement. Additionally, plaintiff attached to its complaint a list of the purchase orders HN allegedly failed to pay pursuant to the terms of the Agreement and requested compensatory damages in an amount equal to the allegedly unpaid purchase orders. Thus, without HN ordering materials pursuant to the Agreement and the alleged failure to pay for the purchase orders pursuant to the terms of the Agreement, there would be no claims. Under these circumstances, it strains logic for plaintiff to suggest that the tort claims are the primary basis for their complaint and that they are in no way related to the Agreement and associated purchase orders. Accordingly, we conclude that there is a sufficient relationship with the Agreement to make plaintiff's claim against HN arbitrable. See *Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 503 (2002) (holding that the plaintiff's own characterization of the acts at issue established "a sufficient relationship with [the parties'] agreement to make his counts arbitrable").

¶ 37　In so holding, we acknowledge authority stating that when a contract is silent on the issue sought to be arbitrated, it does not fall within an arbitration clause providing for arbitration of disputes "arising in connection with" the contract. For instance, in *Silver Cross Hospital v. S.N. Nielsen Co.*, 8 Ill. App. 3d 1000 (1972), the plaintiff entered into a contract with the defendant, a general contractor, to build an addition to its facility. The contract provided that "all disputes arising in connection with this contract shall be submitted to arbitration." The contract also provided that the contractor "shall at all times protect his excavation, trenches, and construction from damage by rainwater, springwater, ground water, backing up of drains or sewers, and all other water" and that "[a]ll work damaged by failure to provide protection shall be removed and

replaced with new work at expense of Contractor." During the course of construction rains caused flooding to the site, resulting in $300,000 in damages. After repairing the damage at its own expense, the defendant served a demand for arbitration upon the plaintiff. The plaintiff refused to arbitrate and brought an action for a declaratory judgment and an injunction to restrain the defendant from proceeding to arbitration. The trial court ruled in the plaintiff's favor and the defendant appealed.

¶ 38    At issue on appeal, was whether the terms of the parties' contract required plaintiff to submit to arbitration. *Silver Cross Hospital*, 8 Ill. App. 3d at 1001. The defendant argued that all disputes arising "in connection with" the contract are arbitrable, and liability for water damage is covered by the contract, so the dispute over liability for the water damage was arbitrable. *Silver Cross Hospital*, 8 Ill. App. 3d at 1002. The plaintiff responded that liability of the owner to the contractor for water damage was not covered by the contract, so the dispute over the plaintiff's liability to the defendant for water damage was not arbitrable. *Silver Cross Hospital*, 8 Ill. App. 3d at 1002. The reviewing court held that the plaintiff did not agree to arbitrate its liability to the defendant for water damage because the contract provisions spoke only of the contractor's responsibilities with respect to water, and made no reference to any responsibilities of the owner relating to water. *Silver Cross Hospital*, 8 Ill. App. 3d at 1002.

¶ 39    The court in *Silver Cross Hospital* relied on *Harrison F. Blades, Inc. v. Jarman Memorial Hospital Building Fund, Inc.*, 109 Ill. App. 2d 224 (1969). *Harrison F. Blades, Inc.* also involved a construction contract. The contractor sought to arbitrate an adjustment of the contract consideration to reflect an additional $200,000 in costs due to changes and delays perpetrated by the owner. The trial court stayed arbitration on the basis that the subject matter proposed to be arbitrated was not an issue encompassed within the parties' contract. The reviewing court agreed.

*Harrison F. Blades, Inc.*, 109 Ill. App. 3d at 226-31. The court held that an agreement to arbitrate damages to an owner caused by a contractor's changes and delays could not be read as an agreement to arbitrate damages to the contractor caused by the owner's changes and delays. *Harrison F. Blades, Inc.*, 109 Ill. App. 3d at 229-31. The court considered the subject matter which the parties had agreed to arbitrate was not simply liability for changes and delays, but rather, more narrowly, the liability *of the contractor* for changes and delays, as distinguished from the liability *of the owner* for changes and delays. *Harrison F. Blades, Inc.*, 109 Ill. App. 3d at 229-31.

¶ 40    In *Silver Cross Hospital* and *Harrison F. Blades, Inc.* the contracts were silent on the issues to be arbitrated. This is not the case here. The Agreement governs the terms of payment of HN's orders with plaintiff. As noted above, plaintiff's claim against HN is predicated upon HN "placing orders with [plaintiff] for which it had no intention to pay." As such, the dispute between the parties "aris[es] in connection with" the Agreement and associated purchase orders. It is therefore arbitrable. Thus, while plaintiff has couched its claim against HN as sounding in tort, the allegations stem from the nonpayment of purchase orders, which is clearly governed by the Agreement.

¶ 41    In short, we conclude that the trial court was correct in finding that plaintiff's claim against HN was subject to binding arbitration pursuant to the Agreement. Because our jurisdiction under Rule 307(a)(1) is limited to considering whether there was a sufficient showing to sustain the trial court's order compelling arbitration (*Postma*, 157 Ill. 2d at 399; *Hollingshead*, 396 Ill. App. 3d at 1098-99), we do not address plaintiff's argument that count I of its complaint properly sets forth facts sufficient to avoid dismissal of its claim for promissory fraud against HN.

¶ 42                    2. Counts Against Remaining Defendants

¶ 43    The trial court granted the motions of Narrol, Perron, and Premier and dismissed the counts

against them with prejudice. Plaintiff argues that the trial court erred in dismissing the counts against Narrol, Perron, and Premier because its complaint set forth adequate facts to support the claims against each of those defendants.

¶ 44                                              a. Standard of Review

¶ 45    The portion of the appeal involving Narrol, Perron, and Premier results from a trial court order granting motions to dismiss plaintiff's complaint under sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619 (West 2020)). A dismissal motion filed under section 2-615 of the Code (735 ILCS 5/2-615 (West 2020)) challenges the legal sufficiency of the complaint. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 14. In ruling on a section 2-615 motion, all well-pleaded facts and all reasonable inferences that may be drawn from those facts are accepted as true. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). However, a plaintiff may not rely on mere conclusions of law or fact unsupported by specific factual allegations. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). The critical inquiry in reviewing a section 2-615 motion is whether the allegations in the complaint, construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Jane Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 Il 112479, ¶ 16. Thus, only those facts apparent from the face of the pleadings, documents attached to a complaint (including exhibits, depositions, and affidavits), matters of which the court can take judicial notice, and judicial admissions in the record may be considered in ruling on a section 2-615 motion. *Bruss v. Przybylo*, 385 Ill. App. 3d 399, 405 (2008); *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 21 (1997). Where allegations made in the body of the complaint conflict with facts disclosed in the exhibits, the exhibits control and the allegations will not be taken as true in evaluating the

sufficiency of the complaint. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 430-431 (2004).

¶ 46    In contrast, a motion to dismiss based on section 2-619 of the Code (735 ILCS 5/2-619 (West 2020)) admits the legal sufficiency of the complaint but raises defects, defenses, or other affirmative matter, appearing on the face of the complaint or established by external submissions, that defeat the claim. *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 6-7 (2007); *Jaros v. Village of Downers Grove*, 2020 IL App (2d) 180654, ¶ 35; *Malinski v. Grayslake Community High School District 127*, 2014 IL App (2d) 130685, ¶ 6. An "affirmative matter" for purposes of a section 2-619 motion is something in the nature of a defense that negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint. *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 29 (2003). The purpose of section 2-619 is to afford litigants a means to dispose of issues of law and easily proven issues of fact at the outset of litigation. *Brummel v. Grossman*, 2018 IL App (1st) 162540, ¶ 22.

¶ 47    Our review under either section 2-615 or section 2-619 of the Code is *de novo*. *Hadley v. Doe*, 2015 IL 118000, ¶ 29; *Malinski*, 2014 IL App (2d) 130685, ¶ 6. Further, we may affirm the trial court's judgment on any basis in the record, regardless of the court's reasoning. *Northwestern Illinois Area Agency on Aging v. Basta*, 2022 IL App (2d) 210234, ¶ 33.

¶ 48                        b. Counts Against Narrol and Perron

¶ 49    Plaintiff argues that the trial court erred in dismissing with prejudice its claims for (1) common-law (promissory) fraud (count I) against Narrol and Perron and (2) aiding and abetting fraud (count II) against Narrol and Perron. According to plaintiff, its complaint sets forth adequate facts to support its claim of promissory fraud against Narrol and Perron because they were active participants in the scheme to defraud it. Alternatively, plaintiff contends that the complaint sets

forth adequate facts to support its claim that Narrol and Perron aided and abetted HN's fraud.

¶ 50    Narrol and Perron respond that the trial court correctly dismissed the claims against them because plaintiff's promissory fraud claim was nothing more than a misnomer breach-of-contract action. Narrol and Perron further claim that plaintiff's fraud claim fails as a matter of law because there was never an agreement to change the payment terms and plaintiff's fraud claim against Narrol was inadequately pleaded. Alternatively, Narrol and Perron argue that the trial court could have granted their motion to dismiss based on the Agreement's arbitration provision. In this regard, Narrol and Perron contend that they were third-party beneficiaries of HN and acted as HN's agents. Thus, Narrol and Perron argue, in the event that this court were to find that the trial court should not have dismissed them from the case with prejudice, we should affirm Narrol's and Perron's dismissal on this alternative basis.

¶ 51                    *i. Fraud—Count I*

¶ 52    The elements of common-law fraud are (1) a false statement of material fact by the defendant, (2) the defendant's knowledge that the statement was false, (3) the defendant's intent that the statement induce the plaintiff to act, (4) the plaintiff's reliance upon the truth of the statement, and (5) the plaintiff's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).

¶ 53    Generally, promissory fraud—a promise of future intent or conduct—is not actionable in Illinois. *Abazari v. Rosalind Franklin University of Medicine & Science*, 2015 IL App (2d) 140952, ¶ 15. The supreme court articulated the rationale for such a rule as follows:

> "If a promise is made to do something in the future and at the time it is not intended to perform the promise, that fact does not constitute fraud in the law. If an intention not to perform constituted fraud, every transaction might be avoided where the facts justified an

inference that a party did not intend to pay the consideration or keep his agreement. A mere breach of a contract does not amount to a fraud, and neither a knowledge of inability to perform, nor an intention not to do so, would make the transaction fraudulent." *Miller v. Sutliff*, 241 Ill. 521, 526-27 (1909).

Thus, typically, misrepresentations alleged in a fraud claim must be of preexisting or present facts. *Abazari*, 2015 IL App (2d) 140952, ¶ 15. However, there is an exception for the rule that promissory fraud is not actionable if the alleged false promises or misrepresentations of future conduct are "alleged to be the scheme employed to accomplish the fraud." *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 69.

¶ 54     To adequately state a claim, the complaint must allege facts that, if proven, would establish the elements of the claim asserted. *Abazari*, 2015 IL App (2d) 140952, ¶ 13. Fraud-based claims are held to a higher standard of pleading, as there must be specific allegations from which fraud is the necessary or probable inference, including what representations were made, when they were made, who made them, and to whom they were made. *Feis Equities, LLC v. Sompo International Holdings, Ltd.*, 2020 IL App (1st) 191072, ¶ 53; *Abazari*, 2015 IL App (2d) 140952, ¶ 13. A plaintiff pleading fraud must allege facts sufficient to establish his or her reliance on the alleged misrepresentations was reasonable or justified in light of all the facts the plaintiff knew and the facts the plaintiff could have learned by exercising ordinary prudence. *Dvorkin v. Soderquist*, 2022 IL App (1st) 201368, ¶ 87. Conclusory allegations are insufficient. *Aasonn, LLC v. Delany*, 2011 IL App (2d) 101125, ¶ 28.

¶ 55     At the outset, we observe that the distinguishing features of a "scheme" are not well articulated in Illinois case law. *General Electric Credit Auto Lease, Inc. v. Jankuski*, 177 Ill. App. 3d 380, 384 (1988). Here, plaintiff contends that its complaint sets forth adequate facts to support

its claim of promissory fraud against Narrol and Perron because they were active participants in the scheme to defraud it. In particular, plaintiff's complaint asserted that HN, through the acts of Narrol and Perron, initiated a months-long scheme to defraud plaintiff by placing orders with plaintiff for which HN had no intention to pay. Plaintiff further asserted that during this time, HN repeatedly promised to pay plaintiff for the goods it ordered while simultaneously requesting extended payment terms and covertly negotiating a secured party sale of HN's assets to a third party. Plaintiff relies principally on *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145 (1989) in support of its position. We therefore turn to that case for guidance.

¶ 56    In *HPI Health Care Services, Inc.*, the supreme court found the plaintiff's allegations were sufficient to allege a scheme to defraud where the complaint set forth "a number of specific factual allegations" supporting its claim that the defendants employed a scheme of repeated and numerous false promises and representations. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 168-69. In this regard, the complaint detailed 11 "knowingly false promises" that each of the defendants allegedly made to induce the plaintiff to continue providing certain goods and services, providing the approximate dates of those representations and factual details regarding the content of those representations. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 165-68. The representations included promises regarding the payment of services, the obtaining of loans, and the implementation of a payment plan. *HPI Health Care Services, Inc.*, 131 Ill. 2d at 165-67. The supreme court concluded the false promises were "the scheme or device to accomplish the [alleged] fraud." *HPI Health Care Services, Inc.*, 131 Ill. 2d at 169.

¶ 57    This case is distinguishable from *HPI Health Care Services, Inc.* As noted above, the plaintiff in *HPI Health Care Services, Inc.* alleged 11 different misrepresentations and provided facts regarding the specific content of those misrepresentations and the dates on which they were

made. By contrast, plaintiff fails to allege what specific misrepresentations were made by Narrol, when they were made, or to whom they were made. The only conceivable factual allegation regarding Narrol pertains to an email dated March 2020, which, according to plaintiff's allegations, was months before the alleged fraudulent conduct began. See *HPI Health Care Services, Inc.*, 131 Ill. 2d 145, 169-70 (1989) (concluding that the plaintiff's complaint did not state a cause of action against one of the named defendants; the complaint failed to provide any specific factual allegations in support of its claim that the defendant at issue participated in a fraudulent scheme, the defendant's conduct occurred prior to the commencement of the alleged fraudulent scheme, and none of the 11 specific factual allegations regarding the alleged scheme mentioned the defendant). Accordingly, we find that the trial court was correct in dismissing count I of the complaint with prejudice as it pertains to Narrol.

¶ 58    Plaintiff insists that its complaint adequately pleaded promissory fraud with the requisite specificity as to Narrol because the complaint establishes that Narrol served as the president and CFO of HN; he supervised Perron; and Perron, during her conversations with plaintiff's representatives, stated that she would discuss payment terms with Narrol. Plaintiff's arguments are not well taken since plaintiff's claims against Perron were also dismissed. And, as we discuss in the following paragraph, the trial court was correct in dismissing count I of the complaint with prejudice as it pertains to Perron.

¶ 59    In particular, plaintiff failed to allege sufficient facts to establish that Perron knew any of the alleged promises to pay were false. Plaintiff cites the fact that Perron repeatedly ordered from HN and requested extended payment terms. However, Perron's requests on HN's behalf for a 90-day payment term, instead of the Agreement's 75-day payment term, were not "false" or "true." There was no assertion of fact by Perron, only a request for extension of payment terms. Thus, this

assertion is without merit. Plaintiff also claims that Perron knew about the secured party sale of HN's assets to a third-party prior to the sale's closing and therefore knew that HN would not be able to pay for the items it ordered. Plaintiff alleges that Perron knew such statements were false based on her role at HN and the acknowledgment that HN was in negotiations with PNC Bank and Ventoux (and later Premier) regarding the sale of its assets for months prior to the sale. However, plaintiff's allegations of Perron's knowledge of HN's sale are well outside of its personal knowledge and is therefore made upon information and belief. See *United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1114 (7th Cir. 2014) (stating that allegations based on information and belief "won't do in a fraud case—for it can mean as little as 'on rumor.' "). While plaintiff notes that the knowledge element of a fraud claim may be inferred based on circumstantial evidence (see *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App. 3d 37, 50 (1979)), plaintiff fails to allege any facts indicating that Perron, in her role as an employee of HN, would have been involved in negotiations for the sale of HN's assets or knew the consequences of a secured party sale, *i.e.*, that the third-party purchaser of HN's assets would not assume any trade payables. Moreover, although plaintiff's complaint alleges that Perron "admitted" that she learned of the sale of HN's assets prior to its closing, it fails to specify exactly when she learned of the sale other than the vague statement that it was prior to the sale closing. Accordingly, we conclude that the trial court was also correct in dismissing count I of the complaint with prejudice as it pertains to Perron.

¶ 60                                   *ii. Aiding and Abetting—Count II*

¶ 61    Plaintiff alternatively argues that its complaint sets forth adequate facts to support its claim that Narrol and Perron aided and abetted HN's fraud. "Under Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act

causing an injury, (2) the defendant was aware of his role when he provided assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood v. Jenner & Block*, 344 Ill. App. 3d 15, 27-28 (2003)).

¶ 62     Plaintiff argues that the complaint sets forth facts that establish the elements for aiding and abetting as to both Narrol and Perron. First, HN perpetrated a scheme of promissory fraud, which resulted in plaintiff incurring not less than $660,225.88 in damages. Second, in the winter and early spring of 2021, by virtue of their positions at HN, both Narrol and Perron knew HN was in default with PNC Bank and that a sale of HN's assets was being negotiated. Further, both Narrol and Perron knew of the actual sale before it occurred, and knew that HN could not—and because of the sale, would not—pay for any goods and services provided to plaintiff. Despite this, Narrol and Perron continued to place and authorize orders with plaintiff. Third, Narrol and Perron knowingly and substantially assisted in the fraud by continuing a business-as-usual approach with plaintiff during that time by requesting extended payment terms for HN with plaintiff and promises to pay its arrearages, promises they knew would not be kept.

¶ 63     We find plaintiff's argument unpersuasive. As noted earlier, Perron was merely an employee of HN. Plaintiff fails to allege any facts indicating that Perron, in her role as an employee of HN, would have been involved in negotiations for the sale of HN's assets or knew the consequences of a secured party sale, *i.e.*, that the third-party purchaser of HN's assets would not assume any trade payables. Moreover, although plaintiff's complaint alleges that Perron "admitted" that she learned of the sale of HN's assets prior to its closing, it fails to specify exactly when she learned of the sale other than the vague statement that it was prior to the sale closing. Moreover, plaintiff's failure to allege what specific misrepresentations were made by Narrol, when they were made, or to whom they were made renders the allegations against him insufficient.

Accordingly, we conclude that the trial court was also correct in dismissing count I of the complaint with prejudice as it pertains to Perron.

¶ 64                                    c. Count Against Premier

¶ 65     In addition to the counts against HN, Narrol, and Perron, plaintiff also asserted a count of common-law fraud against Premier, as the third-party purchaser of HN's assets, for benefitting from the fruits of the allegedly fraudulent scheme orchestrated by HN, Narrol, and Perron. The trial court dismissed the count against Premier with prejudice. Plaintiff argues that the trial court erred in doing so because the complaint clearly sets forth facts demonstrating that Premier accepted the fruits of the promissory fraud knowing the means by which they were obtained, or at the very least, with willful ignorance about the consequences of the sale on vendors like plaintiff. Premier responds that the trial court properly dismissed the count against it because plaintiff has not alleged specific facts that it had either actual knowledge of, or was willfully blind to, any facts of alleged fraudulent activity.

¶ 66     Under Illinois law, if a third party "accepts the fruits of fraud knowing the means by which they were obtained he is liable even though he did not personally participate in the fraud." *Moore v. Pinkert*, 28 Ill. App. 2d 320, 333 (1960). To recover under a claim for knowingly accepting the fruits of purportedly fraudulent conduct, the plaintiff must demonstrate the elements of the underlying fraud claim. See *Pulphus v. Sullivan*, 2003 WL 1964333, at *20 (N.D. Ill. 2003) (applying Illinois law); *Shacket v. Philko Aviation, Inc.*, 590 F. Supp. 664, 668 (N.D. Ill. 1984) (same). As noted above, to state a claim for common-law fraud, a plaintiff must allege that any misrepresentation was: (1) a false statement of material fact; (2) known or believed to be false by the party making them; (3) intended to induce the other party to act; (4) acted upon by the other party in reliance upon the truth of the representations; and (5) resulted in damages to the other

party. *Connick*, 174 Ill. 2d at 496. Additionally, to properly state a cause of action for accepting the fruits of common law fraud, the plaintiff must allege that the beneficiary accepted the benefit of the alleged fraud while knowing how it was obtained. *Moore*, 28 Ill. App. 2d at 333. The knowledge element may be satisfied by demonstrating either actual knowledge or willful ignorance of the fraud. *Pulphus*, 2003 WL 1964333 at *20. Moreover, in Illinois, fraud must be pleaded with specificity and particularity, and a plaintiff must set forth, with specificity, what representations were made, when they were made, who made the representations, and to whom they were made. *Feis*, 2020 IL App (1st) 191072, ¶ 53; *Abazari*, 2015 IL App (2d) 140952, ¶ 13. As such, conclusory statements are insufficient in law to state a cause of action based on fraud. *Aasonn, LLC*, 2011 IL App (2d) 101125, ¶ 28.

¶ 67     Putting aside whether plaintiff adequately pleaded the elements of the underlying fraud claim, we conclude that the trial court correctly granted the motion to dismiss as to Premier. Plaintiff argues that the complaint clearly sets forth facts that demonstrate that Premier accepted the fruits of the promissory fraud knowing the means by which they were obtained. Plaintiff asserts that Premier accepted the fruits of the underlying fraud by purchasing the assets of HN, which had been "enhanced" as a result of the fraudulent conduct of HN, Narrol, and Perron, yet Premier did not compensate plaintiff for HN's unpaid invoices. And, according to plaintiff, its complaint establishes that Premier knew about the underlying fraud based on (1) Wales's roles at both Ventoux and Premier, (2) the timing of the creation of Premier as an entity, and (3) Wales's email explaining that Ventoux, and eventually Premier, had been in negotiations with HN for "several months" prior to the sale.

¶ 68     However, construing the allegations of plaintiff's complaint in the light most favorable to plaintiff, as we must, we find them insufficient to state a cause of action against Premier for

accepting the fruits of common-law fraud. In particular, plaintiff does not detail how the facts alleged in its complaint, standing alone or cumulatively, demonstrate that Premier accepted the fruits of the promissory fraud knowing the means by which they were obtained, or at the very least, with willful ignorance about the consequences of the sale on vendors like plaintiff. Plaintiff does not explain how fraud can be inferred from the fact that a manager at a private equity firm became the manager of a limited liability company established to acquire the assets of a different company. Likewise, plaintiff does not explain how the knowledge element is satisfied by the mere fact that Ventoux created Premier a month prior to the purchase of the assets of HN from PNC Bank. As Premier observes, Ventoux could have purchased the assets of HN itself, thereby demonstrating the irrelevance of the timing of the creation of Premier as an entity. Additionally, the knowledge element cannot be inferred from Wales's email to plaintiff regarding the timing of the negotiations of the secured party sale. Plaintiff posits that, "[g]iven the length of the negotiation period, Premier was aware the [*sic*] HN was still operating and still buying product thorough [*sic*] and including the date of the Sale because it acquired an operating business." We fail to see how the fact that HN was still operating and buying product during the period of time Premier was negotiating the purchase of HN's assets establishes that Premier had actual knowledge of (or was willfully ignorant of) any underlying, allegedly fraudulent conduct by HN, Narrol, or Perron.

¶ 69 Plaintiff also posits that Premier accepted the fruits of the promissory fraud knowing the means by which they were obtained because it knew that a secured party sale pursuant to Article 9 of the Uniform Commercial Code would allow Premier to purchase the assets of HN without assuming its trade payables. However, it is assumed in sales that take place in accordance with Article 9 of the Uniform Commercial Code that the debtor's debt will be unpaid. See 810 ILCS 5/9-617 (West 2020) (providing that a secured party's disposition of collateral after default: (1)

transfers to a transferee for value all of the debtor's rights in the collateral, (2) discharges the security interest under which the disposition is made, and (3) discharges any subordinate security interest or other subordinate lien). As Premier cogently observes, if negotiations between a third party and a secured creditor regarding the secured party sale of an insolvent business creates an inference that the third party is purchasing with knowledge of a fraudulent scheme, then the process for foreclosing on a security interest under Article 9 would collapse, since it would necessarily involve fraudulent conduct every time. Accordingly, while one can infer that Premier had actual knowledge of how Article 9 works to eliminate unsecured debts, plaintiff has not alleged in its complaint specific facts that Premier had either actual knowledge of, or was willfully ignorant of, any facts of alleged fraudulent activity by HN, Narrol, or Perron. Further, the record is devoid of anything that would explain how Premier could have become aware of the allegedly fraudulent scheme. For instance, plaintiff does not allege that Narrol or Perron were officers or managers of Premier at the time of the sale such that any knowledge they had could be imputed to Premier. See *Campen v. Executive House Hotel, Inc.*, 105 Ill. App. 3d 576, 586 (1982) ("[K]nowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority."). To the contrary, plaintiff has alleged that Narrol and Perron were *not* Premier's employees prior to the sale. Similarly, plaintiff does not allege that Narrol or Perron had any decision-making authority for Premier when Premier purchased HN's assets.

¶ 70   In short, plaintiff's pleadings fall short of specifying any manner by which Premier became aware of an allegedly fraudulent scheme that was purportedly perpetrated largely before its corporate existence began. As a result, the trial court correctly dismissed plaintiff's complaint against Premier with prejudice.

¶ 71                                IV. CONCLUSION

¶ 72     For the reasons set forth above, we affirm the judgment of the circuit court of Lake County.

¶ 73     Affirmed.